IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
EL DORADO DIVISION


UNITED STATES OF AMERICA *ex rel.*
DANNY MICHAEL RAY                                                                           PLAINTIFF


VS.                                      CASE NO. 1:09-CV-01016


AMERICAN FUEL CELL AND COATED
FABRICS COMPANY and
THE ZODIAC GROUP                                                                           DEFENDANTS


**MEMORANDUM OPINION AND ORDER**

Before the Court is Defendant American Fuel Cell and Coated Fabrics Company's ("Amfuel") Motion for Summary Judgment. (ECF No. 90). Plaintiff Danny Michael Ray ("Ray") has responded. (ECF No. 94). Amfuel has replied. (ECF No. 99). The matter is ripe for the Court's consideration. Ray alleges causes of action for FCA retaliation and state law breach of employment contract.

**BACKGROUND**

Amfuel manufactures rubberized containers that hold fuel ("fuel cells") and are used in U.S. Military aircraft and commercial aircraft. (ECF No. 92, ¶ 1). During the time at issue in this case, Amfuel also manufactured towable drums for the transport of fuel or water for the U.S. Military. (ECF No. 92, ¶ 2). Amfuel utilizes unique, proprietary internal processes, which it refers to as "NP 474," to manufacture fuel cells that meet the performance specifications required by the U.S. Government for fuel cells to be used in military aircraft. (ECF No. 92, ¶ 3).

Amfuel's quality control department conducts extensive inspection of the fuel cells and towable drums at different stages of the manufacturing process. (ECF No. 92, ¶ 5). If a quality

1

control inspector, Amfuel engineer, or other Amfuel employee concludes that the product has defects, then the quality control department and an engineer decide whether the product can be repaired or whether it should be scrapped. (ECF No. 92, ¶ 6). Repairs are a planned part of the manufacturing process. (ECF No. 92, ¶ 7). The products are largely handmade with a significant error rate. (ECF No. 92, ¶ 8). Therefore, the manufacturing process anticipates repairs to items that fail quality inspection. (ECF No. 92, ¶ 9).

After the products are built, Amfuel's quality control department conducts a number of performance tests before submitting the products to the government. (ECF No. 92, ¶ 10). If the product fails a test, it is either repaired or scrapped. (ECF No. 92, ¶ 13). The U.S. Military's Defense Contract Agency ("DCMA") oversees some of the pre-delivery inspections and performance tests.

Amfuel is one of only two manufacturers of a certain type of fuel cell used for some military aircraft, such as the F-18. As a result, Amfuel has a significant business interest in protecting data related to its proprietary manufacturing processes. Furthermore, Amfuel's manufacturing processes are regulated by the International Traffic in Arms Regulations ("ITAR"). ITAR prohibits the export of arms and related technical data outside the U.S. Information required for the design, development, production, and manufacture of defense articles is covered by ITAR.

Amfuel implemented company policies to ensure that there are no outside disclosures of sensitive, proprietary information. At the time at issue, Amfuel's Policy Manual provided a confidentiality policy, which stated:

> It is the policy of the Company that internal business affairs of the organization, particularly confidential information and trade secrets, represent Company assets that each employee has a continuing obligation to protect…Employees authorized to have

> access to confidential information may be required to sign special nondisclosure agreements and must treat the information as proprietary Company property for which they are personally responsible.

(ECF No. 92, Ex. G). Amfuel's Policy Manual also contained a "Use of Communications Systems" policy, which provided:

> All Company communications services and equipment, including the messages transmitted or stored by them, are the sole property of the Company… Employees should not use email… or any other insecure communications system to communicate confidential, proprietary or trade secret information… All outgoing messages, whether by mail, facsimile, email, internet transmission, or any other means should be… work-related… Improper use of Company communication services and equipment will result in discipline, up to and including termination.

(ECF No. 92, Ex. G). Amfuel's Integrity Handbook reiterates these policies. (ECF No. 92, Ex. H). During the time relevant to this lawsuit, Amfuel also had an Electronic Communications Policy, which provided that in most instances, confidential information should never be communicated via email. (ECF No. 92, Ex. I at 13). It further indicated that Amfuel only permits employees to work remotely under certain circumstances, such as for medical reasons. (ECF No. 92, Ex. I at 16).

Plaintiff Ray was hired by Amfuel in March 2007 as a process engineer. Amfuel offered to pay Ray additional compensation if it implemented any of his recommendations and they resulted in cost savings for Amfuel. Amfuel maintains that a final employment contract was never entered into with Ray, but Ray contends that he signed and returned a revised version of a draft contract which constitutes his employment contract. Ray asserts that Amfuel CEO Bill Mow signed this contract. Amfuel denies that the contract was ever adopted and claims the contract is not in its possession. During discovery, Ray indicated that he had a copy of the contract but now states he has been unable to locate a final and executed copy of the contract.

3

The draft contract that Ray asserts he executed and returned to Amfuel provides that the "Employee shall not, during the term of this Contract of employment or thereafter, disclose any information relative to the business affairs of Amfuel." (ECF No. 92, Ex. K). Ray received copies of Amfuel's policies and Integrity Handbook when he was hired. (ECF No. 92, Ex. L & Ex. M).

Amfuel assigned Ray to work on its fuel cell production line. As a process engineer, Ray's primary job duties were evaluating the manufacturing process and making recommendations to improve it. He worked with quality control inspectors during different stages of the manufacturing process to determine if fuel cells needed to be repaired or scrapped because of defects. However, Ray was not involved in the final stages of inspection and shipping.

Over the course of Ray's employment, he submitted various process improvements to Amfuel management. In the first several months after he was hired, Ray started to chart humidity data recorded by other Amfuel employees in previous years. He found that on hot days, the humidity in certain parts of the plant were not always in compliance with Amfuel's internal manufacturing procedures and could affect the cement bonding in the fuel cells. He shared these findings with his supervisors and recommended that Amfuel obtain a system that would control the humidity throughout the production areas of the 325,00 square foot plant. The plant had never previously been humidity controlled in all areas, but Ray believed that humidity control would result in significant cost savings because it would reduce repairs required to the cement bonding. Ray's supervisor, William Berry[1], told him that Amfuel had been aware of the humidity issue for several years but did not want to spend the money to correct the problem.

---

[1] William Berry was formerly a plaintiff in this lawsuit. Berry's claims were voluntarily dismissed with prejudice on November 4, 2014. (ECF No. 86).

4

At some point before October 2007, Ray was assigned to work in Amfuel's molding area, which was at the opposite end of the plant from the fuel cell area. Around late October or early November 2007, Amfuel assigned Ray to the towable drum department near the molding area. No one told Ray why he was moved and he did not ask, but he believed he was moved because he had voiced concerns about humidity problems in the manufacturing process. Around the same time that Ray was reassigned to the towable drum area, Amfuel CEO Bill Mow told Ray that a work instruction Ray did for the autoclave area of the plant was wrong. As a result of these incidents, Ray concluded that he would be terminated soon.

Ray testified that he attempted to email himself documents from Amfuel because he "wanted to have a showing of the type of work that [he] was doing, the quality of work, to show prospective employers." (ECF No. 92, Ex. D at 42). He "didn't intend to be a whistleblower at first." (ECF No. 92, Ex. D at 30). After the emails failed to go through, Ray told his supervisor, Jason Moss, that he "just wanted copies of his work." (ECF No. 92, Ex. D at 42). Moss showed Ray how to copy and save the information onto a flash drive by saving several documents for Ray. He told Ray that he could save other files onto the flash drive, and Ray subsequently saved all of the documents he had attempted to email. The flash drive contained over 2,000 pages of documents, including documents related to process improvements on military products and data analysis related to his humidity studies. Ray does not deny that he saved documents disclosing process improvements on military products, but he maintains that it was not intentional. Ray also took hard copies of documents home with him.

Amfuel's Human Resources Director, Ben Bauer, and Amfuel's management information systems manager ("MIS Manager") were notified when Ray attempted to send the email. On January 31, 2008, they met with Ray to ask why he tried to send an email with a large volume of

5

attachments to an outside email address. Ray told them that the documents were personal in nature, did not contain proprietary information, and he wanted to work from home and needed the documents. He asserted that his old supervisor had given him permission and his current supervisor, Moss, aided him after the email was blocked. Bauer conducted an investigation and concluded that Moss was not aware of the volume and nature of the information Ray was attempting to acquire. Bauer issued a disciplinary action on February 8, 2008, which stated that the documents Ray attempted to email contained "factory and experimental data relating to the manufacture of these products as well as specifications and other product data." (ECF No. 92, Ex. R). Ray has admitted that Bauer's findings in the write-up are accurate, but maintains that he did not intend to email himself proprietary information and that Moss was aware of the volume of documents.

Shortly thereafter, Amfuel presented its employees in the engineering department with a more stringent non-disclosure agreement. On February 15, 2008, Ray emailed Bauer to notify him of his refusal to sign the new non-disclosure agreement for several reasons, including that he believed he had a right to copies of his work to show potential employers "if" or "when" he leaves. (ECF No. 92, Ex. S). That same day, Amfuel's maintenance director told Bauer that Ray had requested work-related documents from him. On February 18, 2008, two employees reported to Bauer that Ray parked his car in the back of the Amfuel plant near his work station instead of the front employee parking lot. Bauer suspected Ray would try to carry documents off the premises. Later, he and Mow reviewed security footage showing Ray moving boxes from the building to his car. They believed the boxes contained proprietary information.

As a result of Ray's actions, Bauer and the MIS Manager investigated Ray's email activity. They discovered that he had sent at least four emails to outside addresses over several

months that contained personal work as well as ITAR related documents. Bauer recommended to Mow that Ray be terminated for cause immediately. Mow approved this recommendation, and Amfuel terminated Ray on February 25, 2008. Amfuel's stated reason for Ray's termination was violation of Amfuel's policies regarding confidential information and the use of email. Ray alleges that he was terminated because of his studies on humidity. Ray came to this conclusion because Amfuel reassigned him to work in a different part of the plant and Mow disagreed with his work instruction on the autoclave area. He believes that Amfuel did not want people to know about his humidity studies. No one in Amfuel management ever told Ray not to discuss the humidity issue, however, Ray claims that some lower level employees told him to be careful in voicing concerns about the humidity.

It is undisputed that Ray did not decide to become a whistleblower until he had talked to an attorney about his termination. Ray filed a False Claims Act ("FCA") *qui tam* action against Amfuel on March 24, 2009, alleging that humidity levels inside the Amfuel plant were not in compliance with NP 474, Amfuel's unique, internal manufacturing processes. He also asserted causes of action for FCA retaliation and state law breach of employment contract. On March 4, 2013, this Court dismissed the *qui tam* action. (ECF No. 52). Only Ray's FCA retaliation and breach of employment contract claims remain.

## LEGAL STANDARD

The standard of review for summary judgment is well established. When a party moves for summary judgment, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Krenik v. County of LeSueur*, 47 F.3d 953 (8th Cir. 1995). This is a "threshold inquiry of…whether there is a need for trial—whether, in other words, there

are genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); s*ee also Agristor Leasing v. Farrow*, 826 F.2d 732 (8th Cir. 1987). A fact is material only when its resolution affects the outcome of the case. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. *Id.* at 252.

## DISCUSSION

### A. Retaliation

The FCA whistleblower statute provides a cause of action for employees who are discharged because of "lawful acts done by the employee . . . in furtherance of [a civil action for false claims]." 31 U.S.C. § 3730(h); *Wilkins v. St. Louis Hous. Auth.*, 314 F.3d 927, 931 (8th Cir. 2002). In order to establish an FCA whistleblower retaliation claim, a plaintiff must prove that: (1) the plaintiff was engaged in conduct protected by the FCA; (2) the plaintiff's employer knew that the plaintiff engaged in the protected activity; (3) the employer retaliated against the plaintiff; and (4) the retaliation was motivated solely by the plaintiff's protected activity. *Schuhardt v. Washington Univ.*, 390 F.3d 563, 566 (8th Cir. 2004).

#### 1. Protected Activity

Ray contends that he was engaged in a protected activity when he conducted his humidity studies and sent emails with Amfuel documents to his personal email account. He asserts that he had a good faith, objectively reasonable belief that Amfuel was manufacturing fuel cells that were not in compliance with NP 474, and that taking documents, whether for personal or legal purposes, was an act in furtherance of uncovering fraud against the government. Amfuel argues that Ray conducted his humidity studies to help the company improve its manufacturing process,

8

which was part of his job, and that Ray freely admits he took documents in order to have examples of his work for future employers.

Protected activity is established when the employee's actions satisfy two conditions: (1) the employee's conduct must have been in furtherance of an FCA action; and (2) the employee's conduct must be aimed at matters which are calculated, or reasonably could lead, to a viable FCA action. *Schuhardt*, 390 F.3d at 567. The second condition is satisfied if the employee in good faith believes, and a reasonable employee in the same or similar circumstances might believe, that the employer is possibly committing fraud against the government. *Id.* (quoting *Moore v. Cal. Inst. of Tech. Jet Propulsion Lab.,* 275 F.3d 838, 845 (9th Cir. 2002)). "The protected activity element of a retaliation claim does not require the plaintiff to have filed an FCA lawsuit or to have developed a winning claim at the time of the alleged retaliation." *Id.* (quoting *United States ex rel. Karvelas v. Melrose-Wakefield Hosp.,* 360 F.3d 220, 236 (1st Cir. 2004)).

Ray has not established that his humidity studies were in furtherance of an FCA action or that they reasonably could have led to a viable FCA action. He admits that, when he computerized the humidity data, he was not contemplating a whistleblower action, "he was just trying to help the company." (ECF No. 92, Ex. D at 30). Moreover, he cannot show that his investigations could have led to a whistleblower action because his claims about the legal significance of humidity levels are unsupported in the record. It is undisputed that NP 474 is Amfuel's unique, internal processes to manufacture fuel cells that meet the performance specifications required by the U.S. Government. Ray alleges that the fuel cells were not being made in compliance with the humidity standards set forth in NP 474, and that this deviation without government approval resulted in false claims being submitted to the government.

9

However, Ray does not offer any legal authority to support the assertion that Amfuel cannot change aspects of its manufacturing process without government approval.  Furthermore, the Amfuel plant has never had humidity control throughout the entire facility.  If the government required Amfuel to seek approval for its manufacturing processes, including the humidity levels during manufacturing as Ray contends, then presumably the government approved the process without humidity control throughout the plant.

Moreover, other courts that have dealt with the "in furtherance of" condition have found that merely grumbling to an employer about regulatory violations or reporting wrongdoing to supervisors is not acting in furtherance of a *qui tam* action.  *See Mahony v. Universal Pediatric Servs., Inc.*, 753 F. Supp. 2d 839, 847 (S.D. Iowa 2010) *aff'd*, 643 F.3d 1103 (8th Cir. 2011); *McKenzie v. BellSouth Telecommunications Inc.*, 219 F.3d 508, 516 (6th Cir. 2000); *U.S. ex rel. Yesudian v. Howard Univ.*, 153 F.3d 731, 743 (D.C. Cir. 1998).  An internal grievance can serve as the basis for an FCA lawsuit.  *Schuhardt*, 390 F.3d at 567.  However, there should be some evidence that the employee performed the "investigation for" or provided "assistance in" an FCA action.  *U.S. ex rel. Ramseyer v. Century Healthcare Corp.*, 90 F.3d 1514, 1523 (10th Cir. 1996).  The focus is whether the internal complaint "alleges fraud on the government."  *U.S. ex rel. George v. Boston Scientific Corp.*, 864 F. Supp. 2d 597, 606 (S.D. Tex. 2012)(quoting *McKenzie*, 219 F.3d at 516).  "The employee's actions must be aimed at matters demonstrating a 'distinct possibility' of False Claims Act litigation."  *U.S. ex rel. George*, 864 F. Supp. 2d at 605 (citing *United States ex rel. Sanchez v. Lymphatx, Inc.,* 596 F.3d 1300, 1303–04 (11th Cir. 2010) (per curiam)).

Ray's internal grievances alleged that the humidity levels were not in compliance with NP 474, but his actions did not demonstrate a "distinct possibility of litigation."  Nor did his

internal grievances point to an instance where Amfuel sold the government a fuel cell that was defective as a result of the humidity in the plant. In his deposition, Ray could only point to one occasion where he thought a false claim had been submitted to the government, and it was not due to humidity but due to the number of repairs completed on a particular fuel cell.

Likewise, no reasonable jury could find that Ray was engaging in a protected activity by taking documents from Amfuel and emailing documents to himself. Ray indicates that he took the documents because he "wanted to have a showing of the type of work that [he] was doing, the quality of work, to show prospective employers." (ECF No. 92, Ex. D at 42). When confronted by Bauer about the email he attempted to send with a large volume of attached documents, Ray claimed that the documents were personal in nature and he wanted to work on the documents from home. Ray did not take the documents in furtherance of an FCA action, nor was his conduct aimed at matters calculated to lead to a viable FCA action.

Because Ray cannot show that he engaged in a protected activity, he has failed to satisfy an essential element of an FCA whistleblower retaliation claim.

### 2. Notice

Even if Ray was engaging in a protected activity, he has not shown that Amfuel had knowledge of the protected activity. "A plaintiff must show the employer had actual or constructive knowledge of the protected activity in order to establish a *prima facie* case of retaliation." *Schuhardt*, 390 F.3d at 568. "Put simply, an employee has the burden of presenting enough evidence to demonstrate that the defendant was on notice that 'plaintiff was either taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.'" *Id.* (quoting *U.S. ex rel. Ramseyer v. Century Healthcare Corp.,* 90 F.3d 1514, 1522 (10th Cir. 1996)).

Ray has not satisfied his burden of showing that Amfuel had knowledge of a protected activity. As a process engineer, Ray was supposed to work to improve the manufacturing process. Amfuel was aware of humidity issues prior to Ray's employment. Ray completed process improvements indicating that humidity was not in compliance with NP 474 and was hindering the proper bonding of cements, which resulted in rework and excessive scrap. "An employer is entitled to treat a suggestion for improvement as what it purports to be rather than as a precursor to litigation." *U.S. ex rel. Parks v. Alpharma, Inc.*, 493 F. App'x 380, 390 (4th Cir. 2012) (quoting *Luckey v. Baxter Healthcare Corp.,* 183 F.3d 730, 733 (7th Cir.1999)). Ray has acknowledged that he was trying to help the company and did not even consider becoming a whistleblower until after his termination. He claims that he referred to the humidity issues at Amfuel as being "criminal in nature," but he cannot remember exactly what he said or to whom he said it. This vague, unsubstantiated claim is not sufficient to put Amfuel on notice that Ray was contemplating or assisting in an FCA action. The record does not support a finding that Amfuel had actual or constructive knowledge that Ray was contemplating or acting in furtherance of an FCA action. Again, "[m]erely grumbling to the employer about job dissatisfaction or regulatory violations does not satisfy the requirement—just as it does not constitute a protected activity in the first place." *Yesudian*, 153 F.3d at 743.

Similarly, the documents that Ray took from Amfuel did not give Amfuel notice that Ray was acting in furtherance of an FCA action. When Bauer and the MIS Manager questioned Ray about why he tried to email himself a large volume of documents, Ray said that the documents were personal in nature and that he wanted to work from home. Ray told his supervisor, Moss, that he "just wanted copies of his work." (ECF No. 92, Ex. D at 42). No reasonable jury could

find that Amfuel knew Ray was taking action in furtherance of a private *qui tam* action or assisting in an FCA action brought by the government.

### 3. Retaliation Motivated Solely by Plaintiff's Protected Activity

Under the third and fourth elements of an FCA retaliation claim, the plaintiff must establish that the employer retaliated against him and that the retaliation was motivated solely by the plaintiff's protected activity.  *Schuhardt*, 390 F.3d at 566.  Ray contends that adverse employment actions were taken against him after he conducted his humidity studies, and that he was ultimately terminated for conducting the studies and taking documents related to humidity from Amfuel.  He asserts that any other reason Amfuel gives for his termination is subterfuge. Amfuel maintains that Ray was terminated for violating company policies on confidentiality and data security.

Even if Ray had engaged in a protected activity by conducting the humidity studies, he has not produced sufficient evidence to support a finding that Amfuel retaliated against him for the studies.  He alleges that he suffered adverse employment actions when he was reassigned to a different work area of the plant and when Mow disagreed with his work instruction on the autoclave area.  However, Ray admits that Mow never said anything to him about the humidity studies and he only speculates that Mow was even aware of them.  No one from management ever told him to stop discussing humidity issues or conducting humidity studies.  Furthermore, Ray has cited no authority to support his contention that a mere reassignment constitutes an adverse employment action.  He has admitted that there were no other changes in his terms of employment or pay.  Ray has not established that Mow harassed or threatened him, and simply disagreeing with his work instruction on one occasion is insufficient to show retaliation.

13

It is undisputed that Ray took over 2,000 pages of documents from Amfuel in violation of company confidentiality and communications policies. These documents included his study on the humidity in the plant as well as documents containing proprietary and ITAR information. However, Amfuel did not terminate Ray upon his first violation of the company policies. Rather he was counseled by Bauer and received a written reprimand which provided that failure to adhere to company policies in the future would result in further disciplinary action, up to and including termination. Nevertheless, in the following weeks, Ray refused to sign a new non-disclosure agreement, requested work-related documents from the maintenance director, and allegedly carried documents in boxes to his car. Bauer also discovered that Ray had been emailing himself proprietary and ITAR information over the last several months. It was only after these actions that Ray was terminated from Amfuel. If Amfuel was looking for a reason to fire Ray after he voiced concerns about the humidity in the plant, it would have done so at the first opportunity. Accordingly, there is no evidence that Ray's termination was solely motivated by his humidity studies or that there is a causal link between the two.

Ray has failed to establish that he was terminated in retaliation for conducting his humidity studies and taking the humidity study documents from Amfuel. Therefore, even finding *arguendo* that Ray had engaged in a protected activity and that Amfuel had notice of the protected activity, the Court finds that Ray has not met the requirements necessary to satisfy the third and fourth elements of an FCA retaliation claim.

### B. Breach of Employment Contract

Ray claims that he was wrongfully terminated in violation of his contract with Amfuel. He further alleges that he was wrongfully discharged in violation of public policy. Amfuel disputes that the parties ever entered into an employment agreement and contends that even if

they did, Ray was terminated for cause pursuant to the agreement. Amfuel maintains that Ray cannot show that he was terminated in violation of any public policy.

"In Arkansas, the general rule is that an employer or employee may terminate the employment relationship at will." *Hice v. City of Fort Smith*, 75 Ark. App. 410, 413, 58 S.W.3d 870, 872 (2001). There are two main exceptions to this rule: (1) where an employee relies upon a personnel manual that contains an express provision against termination except for cause; and (2) where the employment agreement contains a provision that the employee will not be discharged except for cause, even if the agreement has an unspecified term. *Id.* An at will employee can be terminated for any reason, no reason, or even a morally wrong reason. *Id.* However, "an at will employee has a cause of action for wrongful discharge if he or she is fired in violation of a well-established public policy of the state." *Sterling Drug, Inc. v. Oxford*, 294 Ark. 239, 249, 743 S.W.2d 380, 385 (1988). "A public-policy-discharge action is predicated on the breach of an implied provision that an employer will not discharge an employee for an act done in the public interest." *Id.* at 380.

Ray has failed to show that the parties had an employment agreement that only permitted Ray to be terminated for cause. Initially, Ray thought he had a copy of an executed employment contract in his possession but he has been unable to locate it.[2] Without a contract, Ray cannot show that he could only be terminated for cause. Therefore, the Court finds that Amfuel could terminate the employment relationship at will.

---

[2] The unexecuted draft of an employment agreement that Ray claims was eventually agreed upon by the parties provides that Amfuel may terminate the contract for cause at any time. Additionally, it stipulates that the employee shall not disclose any proprietary information and will enter into Amfuel's confidentiality agreement. Therefore, even if Ray had produced an executed version of this employment contract, it is likely that Amfuel would have been able to show that Ray was terminated for cause after he breached the employment contract and violated Amfuel's policies.

Ray has not established that he was terminated in violation of a well-established public policy of Arkansas. At the time Ray was terminated, he had not become a whistleblower. He told Amfuel that the humidity throughout the plant was not in compliance with NP 474, but he failed to show that this was in violation of a government regulation. Moreover, Ray has admitted that "he was just trying to help the company." (ECF No. 92, Ex. D at 30). It is undisputed that Ray took documents from Amfuel to have copies of his own work to show future employers. He did not take the documents in an effort to protect the public interest. Therefore, no reasonable jury could find that Ray was terminated in violation of a public policy of the state of Arkansas.

## CONCLUSION

For the reasons explained above, Amfuel's Motion for Summary Judgment (ECF No. 90) is **GRANTED** as to Ray's claims for FCA retaliation and breach of employment contract. The Court leaves for later determination Amfuel's counterclaim for injunctive relief.[3]

**IT IS SO ORDERED**, this 2nd day of March, 2015.

/s/ Susan O. Hickey
Susan O. Hickey
United States District Judge

---

[3] The Zodiac Group was dismissed as a party on March 4, 2013 when the Court granted Amfuel's Motion to Dismiss as to the False Claims Act *qui tam* claim. (ECF No. 52).